## DUNAGAN v. BLEDSOE.

### No. 35869.

Supreme Court of Oklahoma.

Jan. 27, 1954.

Rehearing Denied March 9, 1954.

Pierce, Mock and Duncan, Calvin W. Hendrickson, Oklahoma City, for plaintiff in error.

Rollie D. Thedford, and G. Michael Tapp, Oklahoma City, for defendant in error.

O'NEAL, Justice.

Leola Bledsoe, surviving widow of Raymond .Bledsoe, recovered a judgment against the defendant, Mary B. Dunagan, for the alleged wrongful death of Raymond Bledsoe.

It was alleged that the defendant owned and operated a sand and gravel pit near the town of Hugo, Oklahoma; that on the 28th day of August, 1950, Raymond Bledsoe, an employee of George Towers, went upon said premises for a load of sand and gravel, at which time he was struck by a Chevrolet two-ton dump truck operated by one Thomas C. Hawks, defendant's employee, receiving injuries from which he died immediately.

In the conduct of said business defendant used heavy machinery for excavating, dredging, washing, lifting, moving, loading and transporting sand and gravel; that upon part of said premises defendant maintained stockpiles where the washed conglomerate was dumped, drained and dried, and later loaded by means of a power shovel upon trucks for transportation from the pit; these stockpiles were located in a draw or ravine to permit better drainage of the conglomerate and also to facilitate the unloading operations.

On the date of the accident Bledsoe was directed by his employer, George Towers, to go to defendant's pit for a load of sand and gravel. Bledsoe backed his truck to the stockpile and while it was in a loading position a truck driven by Thomas C. Hawks, defendant's employee, loaded with wet gravel from the washer, backed to the edge of one of the stockpiles and at said point defendant's truck ran over Bledsoe's body resulting in his death.

Plaintiff alleged general and specific acts of negligence in that defendant failed to furnish and maintain reasonably safe, wide, roomy and adequate driveway for trucks operating between the washer and the stockpiles; that defendant failed to furnish a watchman to warn customers of the approach of loaded trucks travelling between the washer and stockpiles; that defendant permitted the accumulation of loose gravel over the area which her stock trucks were required to back over and through in unloading operations; that defendant's truck was in a defective condition in that it would slip out of reverse gear, which conditions resulted in the accident and death of Bledsoe.

Plaintiff's action is in her own behalf and in behalf of her minor child for damages for the alleged wrongful death of the deceased.

The defendant denied all material allegations of plaintiff's petition, and further pleaded that plaintiff's deceased was guilty of contributory negligence.

Plaintiff recovered a judgment in the trial court and from the order overruling defendant's motion for a new trial, she appeals.

For reversal, defendant contends that plaintiff's evidence did not establish negligence or any causal connection and, therefore, the trial court erred in not sustaining defendant's demurrer to plaintiff's evidence,

and also erred in not directing a verdict for defendant.

We find no substantial dispute with reference to the physical condition of defendant's sand and gravel pit. At its plant, referred to as the washer, the gravel is elevated by a conveyer to the top of the plant, and by a process of shaking the gravel it is separated into various sizes, water is run through the gravel to cleanse it of dirt and foreign substance. At the bottom of the plant the gravel is released from a chute into trucks for transportation to the stockpiles which are located approximately 150 yards from the washer. As the trucks advance to a point near the stockpiles they make a reverse turn and then back into the stockpiles where the wet load is released. When the plant is in operation trucks with wet gravel leave the plant every few minutes, unload as indicated and return to the plant for reloading. Defendant maintains a dragline at the stockpiles which, on the occasion of the accident, was operated by the defendant's employee, Lockhart. The dragline is operated by a gasoline motor and when in use the exhaust makes so much noise that an approaching truck could not be heard by those near the stockpiles. A large pile of gravel was located on one side of the dragline and a pile of sand on the other side. In loading operations the dragline would lift a bucket of gravel, drop it into the truck, swing over for a bucket of sand and repeat the operation until the truck was fully loaded. Bledsoe signaled Lockhart by hand as he approached the stockpiles indicating he wanted a mixed load of gravel and sand. As he backed his truck into the stockpile Lockhart had picked up a bucket of gravel preparatory to dropping it into Bledsoe's truck. The evidence discloses that there were two ruts or tracks running parallel toward the stockpiles which were used interchangeably by trucks in unloading operations, as well as by the general public in loading operations for transportation from the pit. These tracks or ruts were approximately five feet apart. Trucks had little or no difficulty in backing until they approached the loose and thick gravel. It was then necessary for the driver of a truck to keep the wheels of his truck in the tracks or ruts; otherwise, the truck would stall. As Lockhart emptied one or two buckets of conglomerate into Bledsoe's truck, and as he swung his crane for another bucket, he observed Bledsoe lying in the rut or track used by the truck delivering wet gravel to the stockpile. The defendant's truck at the time driven by Hawks, was parallel with Bledsoe's truck but extended some ten feet nearer the stockpile. Lockhart had not observed Bledsoe get out of his truck but saw him lying in the rut used by the unloading truck. He hollered at Hawks to get Hawks to stop—when Hawks stopped he saw Bledsoe lying near Hawks' truck.

Hawks testified that on the day of the accident he was hauling wet gravel from the plant to the stockpile, and as he approached the stockpile he observed the Bledsoe truck immediately in front of the loading crane. Hawks' truck made a circle and backed into the rut to the left of Bledsoe's truck, which was parked in the right rut. Hawks stated that immediately before backing toward the stockpile he could see both ruts or tracks but as his truck approached the pile he could not see behind his truck. He stated: "I could see all the ruts except directly behind my truck. About ten feet behind my truck there was a blind spot behind the truck."

The defendant's motion for a directed verdict was overruled. The case was submitted to a jury which returned a verdict in plaintiff's favor in the sum of $10,000.

■ In our view of the case the refusal of the trial court to sustain defendant's motion for a directed verdict was proper. The deceased was upon plaintiff's premises on a business transaction. As an invitee the defendant owed Bledsoe the duty to take reasonable care to keep the premises in such a state that the invitee would not be unreasonably exposed to a known danger known by defendant and unknown by the deceased.

■ There is proof supported by defendant's witness, Hawks, that he had on previous occasions hauled wet gravel from the washer to the stockpile; that on the day of the accident he was making a trip

to the stockpile on an average of every ten or fifteen minutes. The evidence with reference to the physical conditions of the approach to the stockpile, the proximity of the two tracks, or ruts, running parallel and with a five feet width, and their use in loading and unloading operations, raises a question of fact for the jury, whether the defendant under the circumstances maintained the premises in a reasonably safe condition for the use of an invitee thereon. The following cases support the rule: City of Tulsa v. Harman, 148 Okl. 117, 299 P. 462; C. R. Anthony Co. v. Williams, 185 Okl. 564, 94 P.2d 836; Magnolia Petroleum Co. v. Barnes, Adm'r, 198 Okl. 406, 179 P.2d 132.

▇ It may be conceded that an invitee assumes all normal, ordinary and obvious risks attendant upon the use of the premises. Nevertheless, an owner who knows, or in the exercise of reasonable care should know, of their dangerous or unsafe condition owes a duty to such invitee to warn him of the danger where the peril is hidden, or the invitee is without knowledge thereof. What is or is not a hidden danger depends not solely upon the obvious physical condition of premises, but must be in part resolved by the peculiar use employed by the possessor at the time of the injury sustained by the invitee.

It has often been said as reflected by the reports, that the duty to keep premises reasonably safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee and would not be observed by him in the exercise of ordinary care. These words connote the editorial license of the scrivener, but are of little aid in determining the application of concrete facts, for in the end we must rely upon our composite instinctive sense of the use of words and the purpose which lies behind them. Usually the real significance and legal consequence of specific words or terms, will depend upon their context, and the nature of the thing they seek to illustrate. A cursory examination of a lexicon will illustrate the point.

In the last analysis it is our duty to decide whether the facts and circumstances of the particular case justify the jury's verdict of the existence of fault and causality.

▇ Eliminating useless verbiage, the law does not require the owner to maintain premises so as to obviate known or obvious dangers but is required to maintain his premises reasonably safe for invitees thereon, and this question in every case must be initially resolved by the jury. The factual background upon which the claim here is founded may be said to be unique, for here the proof does not disclose when Bledsoe left the cab of his truck. There is proof supported by the evidence of Hawks, defendant's employee, and of Towers, Bledsoe's employer, that due to the noise made by the gasoline motor operating the loading crane a person near the stockpiles could not hear the noise of an approaching unloading truck. The proof further discloses no warning was given by Lockhart to Bledsoe of Hawks' approaching truck, although Lockhart in the elevated position on the loading crane did observe the trucks as they backed into the stockpile. Moreover, Towers' testimony disclosed that it was difficult to back into the stockpile if the wheels of the truck were not kept in the ruts, and that he frequently found it necessary to get out of a truck to see if the truck was in a proper position to be loaded. Under this proof, with all reasonable inferences therefrom, we are of the view that plaintiff established actionable negligence and its causality to support the verdict and the judgment thereon.

Judgment affirmed.

HALLEY, C. J., JOHNSON, V. C. J., and WELCH, CORN, DAVISON, WILLIAMS and BLACKBIRD, JJ., concur.